**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No. GLR-01-0304** |
| | : | |
| **CHARLES BYERS,** | : | |
| | : | |
| **Defendant.** | : | |

**MEMORANDUM IN SUPPORT OF MOTION FOR IMPOSITION OF A REDUCED SENTENCE PURSUANT TO SECTION 404 OF THE FIRST STEP ACT**

Charles Byers, who entered a "wired plea" with four other members of a drug conspiracy, has been in continuous custody for almost 19 years, during which time he has:

- cultivated deep and meaningful relationships with his children;
- maintained a strong bond with his wife; and
- completed extensive vocational and educational programming.

Mr. Byers filed a pro se motion asking the Court to reduce his sentence to time served pursuant to Section 404 of the First Step Act. ECF No. 761. The Office of the Federal Public Defender has been appointed to represent Mr. Byers, ECF No. 754, and files this memorandum in support of his pro se motion.

Pursuant to Section 404 of the First Step Act, this Court has the authority to impose a reduced sentence because Mr. Byers was convicted of a pre-August 3, 2010, conspiracy to distribute and possess with intent to distribute controlled substances in violation of 21 U.S.C. § 841(b)(1)(A)(iii), the statutory penalties for which were modified in part by the Fair Sentencing Act ("FSA"). *See United States v. Wirsing*, 943 F.3d 175, 186 (4th Cir. 2019) ("All defendants who are serving sentences for violations of 21 U.S.C. § 841(b)(1)(A)(iii) and (B)(iii), and who are

not excluded pursuant to the expressed limitations in Section 404(c) of the First Step Act, are eligible to move for relief under that Act."); *see also United States v. Gravatt*, 953 F.3d 258, 263-64 (4th Cir. 2020) (holding that the defendant's conviction for conspiracy to possess with intent to distribute 50 grams of crack or more and 5 kilograms of powder cocaine or more is a "covered offense" under the First Step Act, even though the FSA "did not amend the penalties in 21 U.S.C. § 841(b)(1)(A)(ii) regarding powder cocaine").

A time served sentence, which amounts to 226-months imprisonment day for day or almost 260 months with good-time credit, would be a significant and weighty sentence by any measure, and one entirely in line with the penalties called for by U.S.S.G. § 2D1.1. The requested reduction would also take into account the discrepancy between Mr. Byers' sentence and that of a similarly-situated co-defendant, Leon Coleman. Despite pleading guilty to the same count of the indictment, and despite serving nearly identical roles in the drug conspiracy as outlined in their "wired" plea agreements, Mr. Byers received a sentence five years longer than the one Mr. Coleman received.

Mr. Byers' conduct over the past two decades demonstrates that his current sentence of 420 months exceeds what is sufficient, but not greater than necessary, to achieve the goals of sentencing. Mr. Byers' educational and disciplinary records (he has completed approximately 60 courses) while in prison evince a solemn commitment to self-improvement and rehabilitation. Driven by a desire to help his children avoid the mistakes he made, Mr. Byers has remained deeply involved in his children's lives—to great success. Mr. Byers has maintained his marriage to LaRhonda Lomax despite being transferred across the country to Nevada and then California, and she plans to help him upon re-entry. Now a middle-aged man, Mr. Byers is likely to succeed during the lengthy term of supervision following his release from prison. Mr. Byers urges the Court to reduce his sentence to time served.

# BACKGROUND

## I. Plea

On February 26, 2003, the date trial was scheduled to begin, Charles Byers pled guilty in a joint rearraignment proceeding with four co-defendants. Specifically, Mr. Byers pled guilty to Count One of the Superseding Indictment charging him with conspiracy to distribute and possess with intent to distribute fifty grams or more of cocaine base (crack), five kilograms or more of cocaine, and one kilogram or more of heroin, in violation of 21 U.S.C. § 846. Exhibit 1 (Plea Hearing Transcript) at 4. Mr. Byers' plea to all other counts of the Superseding Indictment remained not guilty. *Id.* Mr. Byers pled guilty pursuant to a so-called "wired" plea agreement, which required all the co-defendants to accept the government's plea offer in order for any to receive the benefit of the plea agreement. Mr. Byers' co-defendants all pled simultaneously to nearly identical statements of facts, and all but one pled to the same count of the Superseding Indictment. In order for his co-defendants to get the benefit of the plea agreement, Mr. Byers had to agree to a sentence five years longer than his co-defendants, even though the government's proposed statement of facts suggested co-defendant Leon Coleman was equally culpable.

The joint rearraignment of Mr. Byers and his co-defendants occurred abruptly on the eve of trial. Earlier in the day on February 26, 2003, the Court received the trial seating chart for the government's personnel, and two days before, on February 24, lawyers for the defendants submitted proposed joint voir dire questions. *See* ECF Nos. 356, 359.

The specter of trial in the federal courthouse—with the full weight of the United States against him—was quite intimidating for a young man with limited exposure to the criminal justice system. He had never received a prison sentence for his few prior offenses; and now he faced a possible life sentence. Surrounded by older white attorneys and jurists, Mr. Byers was terrified. At the last minute, he and his co-defendants agreed to plead guilty.

During the plea hearing, for the sake of efficiency, Judge Motz sometimes proceeded jointly, "given the weather and the lateness of the hour." Exhibit 1 at 2. This included the defendants' understanding of their rights and the statement of facts. *Id.* The last-minute plea was so abrupt that the lawyer for co-defendant Darryle Robertson admitted that, because he was "anticipating trial and jury selection today," he "wasn't prepared for the plea" and could not recall the appropriate criminal history category for his client. *Id.* at 30.

The government asserted that Mr. Byers began participating in the charged conspiracy in 1995 at the age of 18 and stopped in 2001 at the age of 25. PSR ¶ 11. During that time, Leon Coleman and Mr. Byers were leaders of a "group of coconspirators" known as the L.A. Boys—including Darryle Robertson, Darryl E. Hairston, and Kevin Glenn—who "distributed heroin, cocaine, and cocaine base" in East and West Baltimore. *Id.* Judge Motz asked each of the defendants whether he agreed to committing the narcotics conspiracy, to which they each said yes. Exhibit 1 at 40-41. Judge Motz then asked, "Now, as to the acts of violence, my understanding is, do you also agree, each of you, that that, that the government witnesses would testify to those as set forth in the stipulation." *Id.* at 41. Mr. Byers, and the others, responded "yes, sir." *Id.*

Neither Mr. Byers nor any of his co-defendants pled guilty to counts of the indictment alleging acts of violence, but rather acknowledged that the government would present witnesses at trial who would testify to those acts. Judge Motz summarized the nuance of the guilty pleas.

> They clearly have stated their guilt. And I saw no, they have stated it. And I frankly saw no hesitation as far as – correct me if I'm wrong, gentlemen – there's no hesitancy to admission of the narcotics conspiracy to which they're pleading guilty, in any respect. What is left, was is the nuance is, they're not necessarily admitting to things about acts of violence but they certainly admit that that's what the government witnesses would testify to.

*Id.* at 42-43. Mr. Byers responded, "yes, sir." After determining that the government was satisfied, even with this distinction, Judge Motz accepted the pleas. *Id.* at 46.

## II. Sentencing

At the time of sentencing on April 18, 2003, the quantity-driven base offense level was 38 based on Mr. Byers' agreement that 1.5 kilograms of crack, 10 kilograms of heroin, and 50 kilograms of cocaine were reasonably foreseeable as part of the conspiracy. However, the cross-reference under U.S.S.G. § 2A1.1 applied because of the stipulation as to what the government witnesses would have testified to, raising the base offense level to 43. PSR ¶ 4. Mr. Byers received a four-level increase for his leadership role in the conspiracy (an enhancement that Mr. Coleman also received), and a two-level downward adjustment due to Mr. Byers' acceptance of responsibility for his actions, for a final offense level of 45 (a total offense level greater than 43 is treated as an offense level of 43). PSR ¶ 5. The PSR assigned Mr. Byers to criminal history category III based on three juvenile convictions and one adult conviction for which Mr. Byers received sentences of probation. PSR ¶¶ 29–34. Until his arrest in this case, Mr. Byers had never served time in prison. *Id.* In the plea agreement, the parties stipulated to a total sentence of 420 months (35 years) imprisonment. PSR ¶ 7.

As detailed in the PSR, Mr. Byers grew up without his biological father in one of Baltimore's most notorious public housing projects, received only an eighth grade education, and drank alcohol and smoked marijuana "on a daily basis" from the age of 14 until his arrest in 2001. PSR at ¶¶ 53–63. As his attorney, Timothy Sullivan, explained at sentencing, "when kids are learning how to pitch in Little League, Mr. Byers was being taught how to pitch vials of crack." Exhibit 2 (Sentencing Transcript) at 15. In his letter to the Court, Mr. Byers describes growing up in Lafayette Courts,[1] a desperate and drug-filled environment:

[1] In 1995, acknowledging that Lafayette Courts had served as a source of poverty and suffering for decades, the City of Baltimore tore down the project. *See* Charles Cohen, *Destroying*

> I saw a lot as a kid that I wasn't suppose to see. I knew what free basing was at 7 years old. I would wake up in the morning with nothing to eat and things like that so me and my cousins would have to go out to the market and steal food to eat. I saw my grandmother selling weed to feed us. We would have to eat off black spoons because cocaine was being cooked and smoked off of them, so I thought this was normal. As I grew up to the age of 11 years old I would hold drugs for anybody that would give me money for food or candy.

Exhibit 3 (Letter from Charles Byers). Despite these serious obstacles, the PSR acknowledges that Mr. Byers was an "exceptional father" to his children and that he strove to maintain close family ties. PSR ¶¶ 55–57. Because the plea agreement specified a sentence, defense counsel did not submit a sentencing memorandum in advance of sentencing. However, Mr. Sullivan (now Judge Sullivan) explained:

> Mr. McCollum and I have spent countless hours with Mr. Byers. And I will tell the Court that, you know, these perceptions of being cold blooded and a bad reputation I don't find to be accurate. I find [sic] this young man who is intelligent, he is smart, he is, in the appropriate times, insightful, he has a sense of humor, he loves his family, he loves his children. If he had been given the opportunities that a lot of other people have, which he was not, he could be standing here as a lawyer for someone. That's how smart he is.

Exhibit 3 at 16.

In imposing the sentence, Judge Motz spoke extemporaneously about the complex nature of drug-related crime and poverty in Baltimore:

> Cases I hear, kids come in like Mr. Byers, 13, 14 years old. They haven't had parents. They haven't had support. As [Mr. Byers' counsel] said, they're learning to deal drugs when other people are learning to play Little League baseball. The gunshots around, they hear them. There's violence. Where do they turn? Where are their fathers? There's an honest question to ask. It's one that people have to come up with an answer to.

*Id.* at 22. Judge Motz accepted the guideline calculations set forth in the PSR, and sentenced Mr. Byers to a term of imprisonment of 420 months, followed by a five-year term of supervised release.

---

*a Housing Project, to Save It*, N.Y. Times, Aug. 19, 1995 at A10, available at https://timesmachine.nytimes.com/timesmachine/1995/08/21/973095.html?pageNumber=10.

## III. Sentence Reduction Proceedings and Post-Offense Conduct

Over the nearly half of his life he has spent incarcerated, Mr. Byers has undergone a remarkable transformation. Building on his strong commitment to family and excellent parenting skills, which were recognized at the time of sentencing, Mr. Byers has engaged in the rigorous and painstaking process of rehabilitation. He has found faith while incarcerated; he has mourned the loss of dozens of friends and family members from a distance; he has maintained a close relationship with his wife and children; he has earned numerous educational certificates. As Mr. Byers' record in prison and the fourteen additional character letters attached to this pleading attest, Mr. Byers has made the necessary choices to step away from the life he led as a young man and towards a generous life dedicated to raising his family and helping others. He explains:

> I have remorse for all the victims that I sold drugs to and harmed. I would like to say I'm sorry to my community. For all the pain I caused and to my family for putting them through so much. I understand now and have changed my thinking and my ways. I want to help the youth now. I don't want young kids to end up like me. I can change [their] life and maybe even the world by putting a simple thought in [their] head... CRIME DOES NOT PAY!!! I was lost before and over the last 20 years I have figured out the real reason why I am here and I'm much happier for it. I found GOD. I have been helping raise my kids from here. My three sons have never been in trouble. 1 has finished college and the other 2 are playing college football. My 2 daughters have been to college and now they have successful jobs. I'm now a grandfather. I came to prison when my kids were new borns and now I have grand kids. . . . In the pass 20 years I have lost a family member for every year I have been locked up, some 2 or 3 a year. Everything from Aids to Senseless violence. It has been so stressful on me and my family. My wife LaRhonda has been by my side every step of the way and thats the reason why I'm still sane to this day. I pray to GOD everyday, all day.

Exhibit 3. LaRhonda has been an exceptional role model for her husband: She served in the U.S. Armed Forces for years, receiving an honorable discharge on March 1, 2020. Exhibit 4 (Discharge Certificate).

On May 5, 2008, Mr. Byers sought a sentence reduction pursuant to Guidelines Amendment 706 and 18 U.S.C. § 3582(c)(2). *See* ECF No. 535. On September 26, 2008, Judge

Motz denied that motion, finding Mr. Byers ineligible because, although Amendment 706 lowered Mr. Byers' guidelines under § 2D1.1, it had no impact on the guidelines range called for by § 2A1.1. *See* ECF No. 544. On July 2, 2018, via a letter to Your Honor (to whom Mr. Byers' case was reassigned after Judge Motz retired), Mr. Byers moved again to reduce his sentence. *See* ECF No. 732.

On June 24, 2020, Mr. Byers filed a *pro se* motion for a sentence reduction pursuant to Section 404 of the First Step Act, *see* ECF No. 761, which unlike his prior requests for a sentence reduction, does not hinge on a change to the applicable guidelines range. *See United States v. Chambers*, 956 F.3d 667, 674 (4th Cir. 2020) ("Under the First Step Act, Congress authorized the courts to provide a remedy for certain defendants who bore the brunt of a racially disparate sentencing scheme. In doing so, it did not import the strictures of § 3582(c)(2), even though it certainly could have. Perhaps it did not want to because it hoped for greater justice for individuals like Chambers.").

## ARGUMENT

Mr. Byers is both eligible for and deserving of sentencing relief. Before August 3, 2010, Mr. Byers committed a violation of 21 U.S.C. § 841(b)(1)(A)(iii), the statutory penalties for which were later modified in part by the FSA. A sentence of 226 months day-for-day would adequately reflect the seriousness of the offense to which Mr. Byers pled guilty and would take into account Mr. Byers' post-offense rehabilitation. A sentence reduction would also reflect the lack of basis in the record for the five-year discrepancy between Mr. Byers' sentence and that of an equally culpable co-defendant, Leon Coleman, the lead defendant in the docket. Even with the reduction, Mr. Byers will have served almost 19 years—the approximate equivalent of a nearly 22-year sentence after factoring in good-time credit. Mr. Byers has all the tools he needs to succeed upon

his return home and has developed a detailed reentry plan in consultation with his wife of two decades, LaRhonda Lomax. *See* Exhibit 3; Exhibit 5 (Letter of LaRhonda Lomax).

**I. Mr. Byers Is Eligible for a Reduced Sentence Pursuant to Section 404 of the First Step Act.**

Because Mr. Byers was convicted of an offense covered by the First Step Act, he is eligible for a reduced sentence. Section 404 of the First Step Act, by its plain language, is broadly applicable to any defendant who was convicted of an offense (1) the statutory penalties for which "were modified by section 2 or 3 of the Fair Sentencing Act of 2010," (2) that was "committed before August 3, 2010" (the date the FSA took effect). First Step Act of 2018, S. 3747, 115th Cong. § 404(a) (2018). For these eligible defendants, the sentencing court "may, on motion of the defendant . . . impose a reduced sentence as if Sections 2 and 3 of the Fair Sentencing Act of 2010 . . . were in effect at the time the covered offense was committed." *Id.* § 404(b). This authority to resentence pre-FSA crack defendants is limited only in two ways. First, the Court shall not entertain a motion for resentencing under Section 2 or 3 of the FSA if the defendant was already sentenced under Sections 2 and 3 of the FSA. *Id.* § 404(c). And second, the Court shall not entertain a motion made under Section 404 if a previous motion under Section 404 was, after the First Step Act was enacted, "denied after a complete review of the motion on the merits." *Id.*

Interpreting the requirements of Section 404(a), the Fourth Circuit has held that "[a]ll defendants who are serving sentences for violations of 21 U.S.C. §841(b)(1)(A)(iii) and (B)(iii), and who are not excluded pursuant to the expressed limitations in Section 404(c) of the First Step Act, are eligible to move for relief under that Act." *United States v. Gravatt*, 953 F.3d 258, 264 (4th Cir. 2020) (quoting *United States v. Wirsing*, 943 F.3d 175, 186 (4th Cir. 2019)). Thus, offenses involving both crack cocaine and other drugs "remain [] covered offense[s]" under the

First Step Act—even if the other drugs were charged in sufficient quantities to trigger the same mandatory-minimum penalty as the crack cocaine. *Id.* at 263-64.

Following the Fourth Circuit's decisions in *Wirsing* and *Gravatt*, there is no question that Mr. Byers is eligible for a reduction in sentence under the First Step Act. Before August 3, 2010, he committed a violation of 21 U.S.C. § 841(b)(1)(A)(iii). At the time of his sentencing, the sole count of his conviction—alleging 50 grams or more of crack cocaine, 5 kilograms or more of powder cocaine, and 1 kilogram or more of heroin—fell within § 841(b)(1)(A)(iii), which established a mandatory minimum of 10-years of incarceration and a maximum penalty of lifetime incarceration. Mr. Byers was not originally sentenced under Sections 2 or 3 of the FSA, and this is his first motion for relief under Section 404 of the FSA. Because Mr. Byers' "sentence involved a covered offense under Section 404(a) and Section 404(c)'s limitations do not apply," he is eligible for a sentence reduction. *Gravatt*, 953 F.3d at 264.

### II. Applying the § 3553(a) Factors, the Court Should Exercise Its Discretion Under Section 404 to Reduce Mr. Byers' Sentence to Time Served.

Although Section 404 does not "require a court to reduce any sentence pursuant to this section," *id.* § 404(c), the Court should exercise the discretion bestowed on it by Section 404(b) and reduce Mr. Byers' sentence. As the Fourth Circuit has held, the Court should consider the factors set forth in 18 U.S.C. § 3553(a), including post-sentencing conduct, in ruling on a motion for sentence reduction where the defendant is eligible for relief under the First Step Act. *See Chambers*, 956 F.3d at 674-75; *see also* 164 Cong. Rec. S7753-01, S7756 (Dec. 18, 2018) (statement of Sen. Nelson) ("This legislation will allow judges to do the job that they were appointed to do—to use their discretion to craft an appropriate sentence to fit the crime."). Mr. Byers has demonstrably rehabilitated himself during his lengthy incarceration. The time he has

served adequately reflects the seriousness of the offense, and a sentence reduction would address an inexplicable disparity in how similarly-situated co-defendants were sentenced in this case.

**A. Mr. Byers' Record While Incarcerated and Character Letters Submitted On His Behalf Demonstrate His Rehabilitation.**

Mr. Byers' 19 years in prison show a lifetime's worth of progress.

First, Mr. Byers has taken more than 60 classes while incarcerated, earning dozens of certificates in a wide array of subjects, and completed drug education and drug treatment at the beginning of his sentence. *See* Exhibit 6 (Inmate Education Data); Exhibit 7 (Certificates). Right out of the gate, in early 2004, Mr. Byers earned his GED. Exhibit 8 (Program Review); Exhibit 9 (GED Test Results). Since then, he has taken a number of courses on business and professionalism in order to prepare for the job search upon release. This includes college-level courses and the acquisition of a ServSafe license for food preparation. Exhibit 10 (ServSafe Certificate). Through additional courses on criminal thinking, communication, anger management, and victim impact, he has used the educational opportunities available in prison to better understand himself, the harm he caused prior to his incarceration, and the circumstances that conditioned his choices as a young man. Exhibit 6. Further, his educational record showcases a curious mind: Mr. Byers has taken courses on non-fiction, history, current affairs, French, and screenwriting, and has earned two 10-hour certificates in adult continuing education courses, one for Language Arts: Nonfiction Texts and one for Higher Order Thinking Skills. Exhibit 7. Finally, it is no accident that Mr. Byers completed 55 of approximately 60 courses in the last ten years, including 14 in 2019 alone and 10 this year. Exhibit 6. Mr. Byers' educational record shows a constant and ever-increasing desire for self-improvement—an upward trajectory.

Second, while not spotless, Mr. Byers' disciplinary record demonstrates that his behavior in prison has improved markedly over time: more than half his violations came during his first ten

years in prison, and he has had no violations at all in the last two and a half years. Exhibit 11 (Inmate Discipline Data). His disciplinary record contains mostly minor violations, the sole 100-level offense being a drug possession citation more than eight years ago. *See* Exhibit 11 (Inmate Discipline Data). An incident in 2007 also involved the possession of alcohol. *Id.* As detailed in the PSR, Mr. Byers consumed alcohol and smoked marijuana on a daily basis beginning at age 14. *See* PSR ¶¶ 62-63. Mr. Byers participated in drug education and treatment while in the Bureau of Prisons ("BOP"), *see* Exhibit 8, but upon release, he would benefit from drug treatment and testing as conditions of his five-year term of supervised release. This conduct is dealt with more readily in the community than through continued incarceration, particularly during the COVID-19 pandemic when so much programming has been suspended. *Cf. Tapia v. United States*, 564 U.S 319 (2011) (holding courts cannot lengthen a defendant's prison term to promote rehabilitation).

Third, the fourteen character letters submitted in support of this Motion describe Mr. Byers' humility, commitment to family, and desire to rejoin society as a productive and peaceful citizen. In other words, they offer compelling evidence—when coupled with his educational efforts while incarcerated—that further incarceration is not necessary as a specific deterrent. Mr. Byers—now older, wiser and chastened by his lengthy sentence—does not pose a danger to the community. To the contrary, he will be welcomed with open arms by a robust network of friends and family.

Letters from those who have known him the longest—including his mother and sister—show both that Mr. Byers has transformed himself over the last two decades and that Mr. Byers' rehabilitation has resulted from the cultivation of positive qualities he has always possessed. His mother, Rosemary, gave birth to Mr. Byers when she herself was a teenager. She says that "[e]ven when he was young, Charles was a very responsible young man. He helped me to take care of his siblings ensuring that they got to and from school safely; and making sure they completed all their

homework assignments." Exhibit 12 (Letter of Rosemary Byers). As an adult, she has seen how he has "been teaching his children not to make the same mistakes he made." *Id.* Ms. Byers knows that her son is capable of leading "a rehabilitated life of giving back to the community." *Id.* Ms. Byers feels the pain of her son's absence more acutely than ever:

> As I am 60 years old now, I reflect upon my life . . . I realize that my days on earth are getting shorter. If only I could be granted time to spend with my son as a rehabilitated and free man at home with me for my remaining years on earth. My greatest need in life is to have my son home. . . Thank you so very much for this kind consideration of this desperate plea and request.

*Id.*

Mr. Byers' sister, Jasmine Smith, confirms that "[m]y brother has always been there for me and my children, he's been my voice of reason and always gives me good advice and support when dealing with everyday life challenges and struggles. He is a role model and a very strong man and deserves a second chance in life." Exhibit 13 (Letter of Jasmine Smith). She has seen him grow "older and wiser, finding a new religion and sticking to his faith." *Id.* He missed out on his children's lives; he recently became a grandfather and she does not want him to miss his grandchildren's lives, too. "I know my brother has changed his life around and would continue to be a better man upon release. He has so much to live for and wants to strive for greatness, with his wife, children, grandchildren and family." *Id.*

Mr. Byers' longtime friends and other family members—including Tyrice Cole, Kathleen Puckett, Lakeisha Dye, and Sharnette Lawson—describe the same responsible and devoted man who has grown markedly since his arrest. To Ms. Lawson—who has known Mr. Byers since the sixth grade and is the mother of Mr. Byers' daughter, Sharnajah—Mr. Byers "has shown that he has matured into a better man" who "is determined to continue to learn from past mistakes by continuing his education and growing spiritually." Exhibit 14 (Letter of Sharnette Lawson). Ms.

Lawson sees a marked contrast between Mr. Byers as he is now and the young man who participated in a drug conspiracy: "Charles Byers went in as a boy and is now a man, with determination to do right by himself and family." *Id.*

Ms. Cole and Ms. Dye confirm that Mr. Byers will have a strong network of support waiting for him upon release because he has taken the extraordinary steps necessary to remain part of their lives during his incarceration. Ms. Cole's admiration for Mr. Byers stems from the difficult period where Mr. Byers supported his wife, LaRhonda, after she lost her mother and the father of her first biological son. Ms. Cole gained "so much love and respect" after watching Mr. Byers help shoulder this burden, a relationship of trust that has only grown during the past nineteen years: "I have been a part of the village that has helped support his family and it was with great pleasure because he is a very respectful, loving, and loyal friend and more importantly someone I call family." Exhibit 15 (Letter of Tyrice Cole). Ms. Cole is confident that because of Mr. Byers' love for his family, "nothing will jeopardize him being away from them ever again." *Id.* Similarly, Ms. Dye credits Mr. Byers with providing critical emotional support following the loss of two of her children, one of whom was Mr. Byers' godson:

> I have lost two kids within the past year and he has been very supportive to me. I was in a very dark place and had isolated myself from the outside world completely and he helped me to realize that I can get through this. He told me I have to remain strong for my other kids. When I speak to him or communicate with him he always put a smile on my face and keeps me in good spirits. I will be forever thankful to him because his words of encouragement and just being the friend he has always been to me has given me my like back and the strength to go on. I know I will forever grieve, but I also know that my kids are in a better place and thanks to [C]harles, I can move on with my kids in my heart and still live a happy life with my other kids.

Exhibit 16 (Letter of Lakeisha Dye). Ms. Dye, who has known Mr. Byers since childhood, "respectfully [asks Your Honor to] take his many accomplishments and the Man he has become

since being incarcerated into consideration" in the hope that Mr. Byers will receive a sentence reduction. *Id.*

Ms. Puckett—who is Mr. Byers' oldest aunt—writes: "Charles always had a loving and a caring heart . . . Charles felt it was his sole responsibility to take care of his siblings. Charles carried that big brother, fatherly responsibility into his own family." Exhibit 17 (Letter of Kathleen Puckett). Mr. Byers has kept up with Ms. Puckett during his incarceration, and Ms. Puckett knows firsthand of Mr. Byers' remorse and his relentless desire to be a good father to his children. Referring to him as "Bok"—a nickname given to Mr. Byers by his late great aunt—Ms. Puckett urges:

> In closing, Charles Byers has a family that loves and cares about him. I know Bok carries a heavy heart. He has lost many family members since being incarcerated and most of all Charles is carrying the burden of his children not having their father present in their lives like his father was not present in his life.

*Id.* From the well of the numerous losses he has suffered while incarcerated, Mr. Byers has drawn the strength to uplift others in times of hardship.

Close relatives of Mr. Byers' wife, LaRhonda, offer an additional testament to the way Mr. Byers' complete rehabilitation has allowed him to serve as a source of compassion and grace. To Kimya Lomax, LaRhonda's sister, Mr. Byers has been "like a brother and a father." Exhibit 18 (Letter of Kimya Lomax). When Kimya and LaRhonda's father was incarcerated, "[Charles] took the time to care for and about all of us," an intervention that changed Kimya's life. *Id.* Kimya is confident that "Just like our dad who did not return to prison once he was released . . . Charles will follow this same example." *Id.* LaRhonda's aunt, Linda Lomax, has similarly witnessed Mr. Byers' personal transformation and commitment to others in the countless nights that he spent on the phone with LaRhonda while she was in nursing school, helping her study and providing encouragement. *See* Exhibit 19 (Letter of Linda Lomax).

As every character letter written on Mr. Byers' behalf has made clear, Mr. Byers' release would manifestly improve the lives of those around him:

> Charles has learned through the years of his incarceration that being in prison does not determine who you are or going to become in life . . . [H]e is a person that humbles himself when it comes to doing time in prison and how to handle his circumstances. He has become a spiritual man that inspires others to connect spiritually. I have seen him grow tremendously into manhood by teaching the young men coming into the system how to humble themselves. I think Charles will be a great asset to his family and friends once he is released.

*Id.* Mr. Byers has demonstrated selfless loyalty to friends and family, all the while improving his judgment, contemplating his past mistakes, and preparing for a productive future upon release.

Finally, for those Mr. Byers is closest to—his wife and children—Mr. Byers' release cannot come soon enough. Letters from Mr. Byers' son, Charlie Byers, Jr., and his daughters, Ragan Byers and Sharnajah Byers, describe a loving father who has done everything in his power to make sure his children do not make the same mistakes he did. Ragan, who recently gave birth to one of Mr. Byers' grandchildren, writes:

> Dad made sure to call and write. He helped me with my homework. He gave encouragement. He does a lot even though he is far away . . . As a grandpa, he should be able to hold and hug his grandbaby. I hope you give him a chance to do that. Because I know how it feels growing up with my mother having to do everything. My dad wants to help in all the ways he couldn't [when I was] a kid.

Exhibit 20 (Letter of Ragan Byers). Recognizing the positive impact Mr. Byers had on her life even while he was incarcerated, Ragan wants what is best for her and her child: Mr. Byers' active presence as a grandfather.

Similarly, Charlie Byers, Jr. ("Charlie") credits his success to his father's positive influence:

> I am now on full scholarship at Fullerton College in California. I did well in school (public and private) because my Dad wouldn't have it any other way. I am striving for excellence because of the way my Dad has raised me. We never lived together

> but he [has] always been there to make sure I stayed away from the street life and stuck to my studies and especially sports!

Exhibit 21 (Letter of Charles Byers, Jr.). Further, Charlie has witnessed his father's transformation during his decades of incarceration:

> My dad is very serious about doing the right thing and standing up for what is right. He talks to me about the mistakes he made and how he used what happened to him [to] understand God. My dad is very religious and believes in the power of forgiveness. First he learned to forgive himself and then he learned to forgive anyone who he felt had done him wrong. When he was young he got in trouble but he doesn't let the wrong rule his life anymore. We talk a lot and when we do it's all about standing up and being a man which means doing right by family, society, and God.

*Id.*

Sharnajah Byers emphasizes that the key to Mr. Byers' growth has been his remorse: "The first step of his growth was taking responsibility for the actions that caused his incarceration," a step Mr. Byers has demonstrated in his successful efforts to steer his children onto the right path. Exhibit 22 (Letter of Sharnajah Byers). Sharnajah puts it succinctly: "[H]is time in prison has molded him to be a better man, and now it is time for him to come home." *Id.* Mr. Byers' relationships with his children demonstrate his dedication to changing himself for their betterment—and why he would never engage in behavior that could risk taking him away from his family again.

Mr. Byers also has maintained a strong relationship with his wife, even though he has spent almost all of their two-decades of marriage incarcerated at facilities around the country. After Mr. Byers' sentencing, LaRhonda went on to earn an advanced nursing degree and serve in the Navy, from which she was honorably discharged in 2020 after earning the rank of Lieutenant. *See* Exhibit 4. LaRhonda, too, credits the success of their children and their marriage to Mr. Byers' involvement:

> Charles stayed as involved as he could—we talked frequently and I visited regularly until his transfer to Nevada. During this time we have remained committed to our religion and three children, who have grown into fine young people who are free of the criminal justice system, and are all productive members of the community. This is no accident, this is in large part because of the inspiration, guidance, and support Charles has provided to his family—who encouraged us to overcome our obstacles by focusing on positive possibilities.

Exhibit 5. And, LaRhonda confirms what the rest of the character letters and Mr. Byers' record clearly show: "Over these 19 years, Charles has matured into an honorable and repentant man." *Id.*; *see also* Exhibit 24 (Letter from Amiya Lewis) ("He has always been an outstanding father and [has] always been there for his children. My uncle has really grown over the years . . . ."); Exhibit 25 (Letter from Robert Lewis) ("The release of my son will be one of the best days of our lives . . . ."). The consistent strength of Mr. Byers' relationships with his wife, children, friends, and other family members over the past 19 years demonstrates that he has people who will hold him accountable, making a longer sentence unnecessary to prevent recidivism.

Lastly, Mr. Byers has demonstrated in his own letter to the Court that he is rehabilitated, does not pose a danger to the community and is deserving of a sentence reduction. In addition to his statements of remorse and self-discovery, Mr. Byers has laid out serious plans for his future. His letter to the Court includes a detailed plan for continuing his education and obtaining employment after release, including three-month, six-month, one-year, two-year, and five-year plans. *See* Exhibit 3. Further, as his wife discusses in her letter, Mr. Byers and Ms. Lomax already have plans to start and run a business together after Mr. Byers is released. *See* Exhibit 5. By all accounts, after nearly twenty years of incarceration, Mr. Byers has taken responsibility for his past mistakes and has prepared himself for a productive re-entry into a community filled with people who love him and are ready to help him just as he has helped them in their times of need.

### B. Mr. Byers' Sentence, Which Has Already Served Its Statutory Purposes, Should Not Be Longer Than Mr. Coleman's.

Reducing Mr. Byers' sentence would adequately reflect the seriousness of the offense. First, if Mr. Byers was sentenced today under the current version of § 2D1.1, he would receive a base offense level of 34 based on the converted drug weight applicable in his case. Adding the four-level role enhancement and subtracting two levels for acceptance of responsibility, Mr. Byers' final offense level would be 36. Given a criminal history category of III, Mr. Byers' guideline range would be 235-293 months. If Mr. Byers had been sentenced in the middle of that range, he would have received a sentence of 264-months imprisonment. With the standard good conduct time credit of approximately 15%, he would have completed that sentence after 224.4 months (which is 85% of the imposed sentence of 264 months). Mr. Byers has currently served 226 months, which is 62.2% of his statutory term of imprisonment. *See* Exhibit 23 (Sentence Computation Data).

Further, the record of the case does not justify the five-year discrepancy between Mr. Byers' sentence and Mr. Coleman's sentence. Despite pleading guilty to the same count of the superseding indictment, despite their plea agreements describing the same acts of violence, and despite the fact that they were given identical four-level role enhancements resulting in identical final offense levels, Mr. Byers was sentenced to 420-months imprisonment while Mr. Coleman received a 360-month sentence. While these sentences arose in the context of two plea agreements, the all-or-nothing nature of these "wired" pleas agreed to on the eve of trial put immense pressure on all five co-defendants, including Mr. Byers, to accept their agreements with little pushback. At the very least, Mr. Byers should not be serving a sentence five years longer than a co-defendant pleading to the same offense on the same facts with the same leadership role and a higher criminal history category. Indeed, that Mr. Byers was willing to do so on the eve of trial—no doubt to spare

his co-defendants from lengthier sentences—demonstrates his willingness to put the interests of others before his own.

Finally, Mr. Byers' sentence has served its deterrent purpose. The BOP has evaluated his risk of recidivism and places him at a low risk of reoffending. *See* Exhibit 26 (BOP Risk Assessment). At age 42, Mr. Byers has spent nearly half his life in custody. Mr. Byers was only 18 years old when he joined the drug conspiracy for which he received his 420-month sentence. Prior to his instant incarceration, he had never served a day in prison. A 19-year sentence for someone who had never been incarcerated before is a very serious sanction. Thus even a time served sentence would send a strong message of deterrence to anyone considering whether to engage in the same conduct that landed Mr. Byers in prison—particularly now given the impact of the ongoing COVID-19 pandemic on the federal prison system. *See* Vice, *Sick Staff, Inmate Transfers, and No Tests: How the U.S. is Failing Federal Inmates as Coronavirus Hits* (Mar. 24, 2020).[2]

As his record in prison and character letters demonstrate, Mr. Byers has made considerable progress while incarcerated, including maintaining a successful marriage and raising three college-educated children. He has already served a lengthy, 226-month term of imprisonment that is consistent with the § 2D1.1 guidelines range. And, without any grounding in the facts of the case, his imposed sentence of 420 months is 5 years longer than that of his co-defendant, Leon Coleman. With the support of his loved ones and the U.S. Probation Office for the five-year term of supervised release to follow his sentence, Mr. Byers is likely to succeed upon his return home.

[2] Available at https://www.vice.com/en_us/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits.

## CONCLUSION

For the foregoing reasons, Mr. Byers respectfully requests that the Court grant his motion for imposition of a reduced sentence pursuant to Section 404 of the First Step Act and enter an amended judgment sentencing him to time served. He does not request a reduction of the five-year term of supervised release to follow his sentence.

Respectfully submitted,

JAMES WYDA
Federal Public Defender for the District of Maryland

/s/

SHARI SILVER DERROW (#19181)
KATHERINE TANG NEWBERGER (#27803)
Assistant Federal Public Defenders
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Phone: (410) 962-3962
Fax: (410) 962-0872
Email: shari_derrow@fd.org
katherine_newberger@fd.org